UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X

SANKALP BHATNAGAR

                Plaintiff,

       - against –

PARSONS SCHOOL OF DESIGN and
THE NEW SCHOOL

                Defendants.

-------------------------------------------------------------------------X

      Index No.

      **COMPLAINT**

      **Jury Trial Demanded**

Plaintiff, by his attorneys, Shebitz Berman & Delforte, P.C., as and for his Complaint herein, alleges as follows:

## THE PARTIES

1.    Plaintiff, Sankalp Bhatnagar ("Mr. Bhatnagar" or "Plaintiff"), is an individual or person as defined under the applicable sections of the Americans with Disabilities Act of 1990, Section 504 of the Rehabilitation Act of 1973, Title VI of the Civil Rights Act of 1964, and the New York State and New York City Human Rights Laws.

2.    Plaintiff is an American citizen of Indian (South Asian) background, race, and ethnicity.

3.    Upon information and belief, Defendant, Parsons School of Design ("Parsons" or the "school" or the "college") is, and at all relevant times herein has been, a college within Defendant, The New School, and a part of the New School, an education corporation organized and existing under the laws of the State of New York, which has its principal place of business in New York, New York. As such, the New School is liable for all acts and omissions of Parsons set forth herein and the two entities are collectively referred to herein.

1

4.     Upon information and belief, Defendants accept public funding via federal student aid and other federal and state funds.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction under 28 U.S.C. §1331, in that claims are asserted under the laws of the United States, and under 28 U.S.C. §1343(a), in that claims are asserted providing for the protection of civil rights.

6.     The Court has jurisdiction over Mr. Bhatnagar's pendent state and city law claims pursuant to 28 U.S.C. §1367.

7.     Venue is proper under 28 U.S.C. §1391(b).

## PRELIMINARY STATEMENT

8.     This lawsuit is being commenced because Defendants purposely, wantonly, and intentionally discriminated against Mr. Bhatnagar in an effort to remove him from their school.

9.     Parsons' employees, including Deans and Provosts at the highest level of the college, participated in intentional discrimination against Mr. Bhatnagar, ultimately culminating in forcing a fabricated degree upon Mr. Bhatnagar, in order to remove him from the college, because he was a student that they perceived as having a disability of mental illness.

10.     Parsons also grounded their action of forcing Mr. Bhatnagar out of their school on the basis of his race, ethnicity, and national origin, as Parsons' leadership viewed him as a security threat for no legitimate reason based solely on their stereotypes regarding an individual with brown skin and a South Asian background and name.

11.     In so doing, Parsons violated the Americans With Disabilities Act of 1990, 42 USC §12101 et. seq., Section 504 of the Rehabilitation Act of 1973, 29 USC §701 et. seq., Title VI of

2

the Civil Rights Act of 1964, 42 USC §2000d et. seq., the New York State Human Rights Law, NY Executive Law, Article 15, and the New York City Human Rights Law, New York City Administrative Code, § 8-101 et. seq.

12.     Parsons also violated New York Education Law and its own Master Plan by conferring a degree upon Mr. Bhatnagar even though it knew Mr. Bhatnagar had not completed various degree requirements including the most essential task – completing a faculty-reviewed written thesis and accompanying design project.

## BACKGROUND FACTS ABOUT MR. BHATNAGAR AND HIS START AT PARSONS

13.     Mr. Bhatnagar had a stellar academic career prior to enrolling in the Transdisciplinary Design MFA program at Parsons ("the program").

14.     Mr. Bhatnagar had previously studied at Carnegie Mellon University, where he earned a Bachelor of Sciences and Arts dual degree in Mathematics and Design with honors and a Master of Arts in Design.

15.     He additionally served as a Visiting Researcher and Student Fellow at the Leverhulme Centre for the Future of Intelligence at Cambridge University, United Kingdom as well as a Fellow with the Zolberg Institute on Mobility and Migration at the New School. He had also been an invited presenter and guest at various top-level universities and academic societies and forums throughout the world.

16.     For his MFA studies, Mr. Bhatnagar applied to and was accepted into programs at Parsons, the School for Visual Arts, Art Center College of Design, and the Royal College of Art, London. He chose the Parsons program because he viewed it as the best program to set him up to successfully apply to the world's best PhD programs in pursuit of a research career in the design field.

17.     Mr. Bhatnagar began in the program in Fall 2016 and flourished academically immediately, including being chosen by the Program Director Lara Penin as the "Transdisciplinary Design Fellow" for 2017-2018, a position that is offered to only one student that exhibits both academic excellence and intellectual curiosity about design annually.

18.     He maintained his stellar academic standing, while also serving as a Research Assistant and Teaching Assistant for multiple faculty members, throughout his tenure in the program until Spring 2018, which was Mr. Bhatnagar's fourth semester at the School.

19.     In the prior three semesters, Mr. Bhatnagar had grade point averages of 3.93, 4.00, and 3.94, respectively.

## PARSONS' DISCRIMINATORY ACTIONS

20.     Despite the pristine start to his academic career at Parsons, beginning in February 2018, Mr. Bhatnagar started to experience problems with his thesis course instructors and support providers at Parsons.

21.     These problems began around what appeared at first to be routine graduate student scheduling and related issues.

22.     Specifically, Mr. Bhatnagar had to work out schedules with his professors as certain classes conflicted with teacher assistant ("TA") obligations that he had at Parsons.

23.     Mr. Bhatnagar also reached out to his Intensive 3: Charrette instructor, Eduardo Staszowski, the director of Parsons' Design for Social Innovation and Sustainability lab, to receive a class syllabus and to avail himself of an optional "alternative assignment" which was being offered for students with schedule conflicts.

24.     Rather quickly after attempting to resolve these routine academic and scheduling issues, Mr. Bhatnagar started to notice that Mr. Staszowski (and soon others) were treating him in

bizarre and confusing ways, including accusing him of being a problem student because he was essentially asking too many questions and challenging assumptions within design programming.

25.     Mr. Bhatnagar met with Mr. Staszowski on February 21, 2018 to try to work out these issues and was told out of the blue by Mr. Staszowski that his request for the alternative assignment and his need to modify his schedule around his TA duties was "sabotaging himself" and Mr. Staszowski warned Mr. Bhatnagar that he should trust him because he had a Ph.D. and that he knew about Mr. Bhatnagar, despite only having taught him for two days, because "people talk".

26.     Mr. Bhatnagar's method for his thesis project at this time consisted of gathering data from various sources of the University to understand a role for design in bringing about institutional learning including, but not limited to, an historic analysis of the changes to the program throughout the program's history. This method included inquiry about the program and questions that professors perceived to be critical and challenging to their authority and included a prototype that compiled faculty and student changes to the program throughout the program's history, some of which were not complimentary.

27.     On February 27, 2018 Mr. Bhatnagar met with Mr. Staszowski's wife, Lara Penin, the Program Director (and Mr. Bhatnagar's thesis advisor), who criticized Mr. Bhatnagar's thesis proposal for being critical of Parson's design program which she led, accused Mr. Bhatnagar of "sabotaging himself" by asking questions and challenging the authority of his instructors including her husband Mr. Staszowski.

28.     Ms. Penin was very confrontational toward Mr. Bhatnagar during this meeting and asked "what he was trying to prove" and told him that she "won't authorize [him] to do this" study

of the Parsons design program because the program "is part of a university and universities are not businesses."

29.     Once again, Mr. Bhatnagar was stunned by the comments.    While the thesis proposal asked provocative questions, Mr. Bhatnagar believed the questions were all valid academic inquiries, particularly because this data was publicly available at that time.

30.     Ms. Penin then gratuitously offered Mr. Bhatnagar the *voluntary* opportunity to speak about any issues he was having with Parsons' Student Support office.

31.     Less than three hours after this meeting, the Student Support office, which includes the school's counseling services and crisis management offices, contacted Mr. Bhatnagar by email and told Mr. Bhatnagar that they were asked to do so by Ms. Penin.

32.     Andrea McFarlane, Student Support Advisor, told Mr. Bhatnagar in that email that Ms. Penin and Jill Corson of Academic Advising were "concerned about you based on information that you've shared with them."  He was stunned and had no idea why they felt he needed student support intervention.

33.     Mr. Bhatnagar met with Ms. Penin about his thesis on March 6, 2018. During this meeting, Mr. Bhatnagar told Ms. Penin that he did not understand how their working relationship had soured and their trust eroded, and he asked how he can fix that issue.  Ms. Penin responded by saying that they did not have a trust issue but proceeded to criticize his thesis project and told him not to embarrass her during the upcoming mid-semester thesis presentation.  He once again did not understand the basis for her comments.

34.     In light of Ms. Penin's expressed dissatisfaction with his thesis topic and method, Mr. Bhatnagar sought to consider other thesis options. Upon the direct recommendation of another faculty member, Dr. Shana Agid, Mr. Bhatnagar reconsidered his thesis focus and plan for mid-

6

semester presentation at this time and proceeded to explore other avenues including visiting with the school's archivist to discuss a new thesis approach.

35.     On March 15, 2018, after feeling pressured and concerned about his thesis project because of his troubling interactions with Mr. Staszowski and Ms. Penin, Mr. Bhatnagar did indeed modify his thesis presentation when he presented it during his mid-Semester review. He did this because of Ms. Penin's admonition to him to change topics and not embarrass her or the program. Mr. Bhatnagar only changed the topic of the presentation to a topic unrelated to his thesis (a student organization that he co-founded) in order to simply meet the requirement to present at that time, since he was still in limbo because of the interactions with Ms. Penin described above.

36.     After Mr. Bhatnagar presented, Ms. Penin opened the question and answer portion of the presentation by telling the audience that what Mr. Bhatnagar had presented was not even his thesis and described to the audience what *she* wanted his thesis to be. This was embarrassing and humiliating for Mr. Bhatnagar, who had only changed his presentation because of the pressure from Mr. Staszowski and Ms. Penin and to accommodate Ms. Penin's concerns in the first place.

37.     Meanwhile, in the days leading up to the thesis presentation, including earlier in the day on the day of his presentation, Jill Corson reached out to Mr. Bhatnagar several times to schedule a meeting with her. Mr. Bhatnagar had not requested any such meeting. He found the repeated requests troubling since he believed he had no reason to meet with her and this caused Mr. Bhatnagar great anxiety.

38.     They scheduled the meeting for March 16, 2018, the day after the thesis presentation. Mr. Bhatnagar attended that meeting with Ms. Corson and Mariah French of Student Support, who both apologized to Mr. Bhatnagar for the treatment he received from Mr. Staszowski and Ms. Penin and gratuitously offered to him that, to them, he "sound[ed] lucid". He was taken

7

aback by this comment because nobody at that time had suggested that he was anything other than "lucid" and he did not know whether Mr. Staszowski or Ms. Penin or anybody else had suggested otherwise, or why.

39.     By this time, it had become apparent to Mr. Bhatnagar that he would not be able to work directly with either Mr. Staszowski or Ms. Penin and he formally requested a change of thesis advisor.

40.     Mr. Bhatnagar also was concerned that, given the trouble he faced to begin the Spring 2018 semester with Ms. Penin and Mr. Staszowski, and with having to pivot on his thesis topic direction and perform additional research and find a new thesis advisor, he would not be able to properly finish his thesis on time that semester. Mr. Bhatnagar felt this way and believed he needed a new thesis advisor, because it was the very people that were supposed to be working with him on his thesis that were treating him so unfairly.

41.     On March 29, 2018, Mr. Bhatnagar met with Ombudsman Keisha Davenport-Ramirez and discussed his bizarre interactions with Ms. Penin and Mr. Staszowski and to understand how to formally request a change of advisor. Ms. Davenport-Ramirez told Mr. Bhatnagar that she understood his concerns and informed him that the school would work with him to change his advisor.

42.     To ensure that he would have sufficient time to complete his thesis under different faculty advisement and guidance, Mr. Bhatnagar inquired and was informed about the option of "Maintenance of Status", which would allow him to remain in the program for up to an additional year, depending on the circumstances, in order to have sufficient time to complete his thesis.

43.     On April 5, 2018, Ms. Corson confirmed the Maintenance of Status option with Mr. Bhatnagar, offering the possibility of remaining in the program through conferral dates of June 15,

8

August 31, and December 31, 2018, and again indicating graduate students have taken up to an additional year to complete their thesis requirements and coursework.

44.     Ms. Corson also explained to Mr. Bhatnagar that Maintenance of Status was common for graduate students at the School, and this was confirmed by faculty, including by Jamer Hunt, the Founding Director of the Transdisciplinary Design Graduate Program and Vice Provost of Transdisciplinary Initiatives at Parsons at that time.

45.     After having met with Ms. Penin three separate times to work out the details of Maintenance of Status and to understand all of his options, Mr. Bhatnagar emailed Ms. Penin on April 27, 2018 to let her know that he was planning to complete his thesis through Maintenance of Status through Fall 2018 and to let her know that while he greatly respected her work, their recent interactions caused him considerable anxiety and that therefore he knew he would need to seek a new thesis advisor.

46.     Contemporaneously, Mr. Bhatnagar was communicating with other faculty at Parsons in order to arrange for a different faculty advisor for his thesis, and he believed that such a change would take place since there was clearly an issue with Ms. Penin.

47.     After starting the process towards Maintenance of Status and changing thesis advisors, during a meeting with Ms. Penin on April 25, 2018, Ms. Penin suggested to Mr. Bhatnagar for the first time, unprompted, that Mr. Bhatnagar consider "graduating without completing [his] thesis project" rather than stay at the School any longer to complete the project.

48.     Upon information and belief, Ms. Penin had no rational basis for suggesting to Mr. Bhatnagar that he graduate without completing his thesis. Rather, upon information and belief, Ms. Penin made the suggestion because she and some of her colleagues wanted Mr. Bhatnagar out of the program and to leave the school.

49.     Even though Ms. Penin was beginning to push him towards graduating before his thesis was complete, Mr. Bhatnagar was continuing the typical process for his thesis project, including that he presented a thesis check-in presentation to his department on May 10, 2018. This presentation included Mr. Bhatnagar outlining his next steps for the project.

50.     Furthermore, on May 30, 2018, Ms. Corson confirmed to Mr. Bhatnagar that she had notified the School's registrar that he would be maintaining status beyond Spring 2018, and that she would contact Ms. Penin to confirm and follow through.

51.     In mid-June 2018, while Mr. Bhatnagar was attending academic conferences in the United Kingdom, the School contacted him and insisted that he come in for a meeting immediately.

52.     Mr. Bhatnagar explained that he could not attend any in-person meeting as he was out of the country and was concerned about the urgent nature of the meeting request.

53.     Within days after this communication, while Mr. Bhatnagar was still out of the country, Dean of School of Design Strategies, Jane Pirone, sent Mr. Bhatnagar several emails outlining non-negotiable terms for continuing his degree, and unilaterally set a July 25, 2018 deadline for full thesis submission. This was yet another completely unexpected mixed message and caused great stress and anxiety for Mr. Bhatnagar.

54.     These emails from Ms. Pirone also rescinded the offer of the December 31, 2018 conferral date, for no apparent reason, again adding to Mr. Bhatnagar's substantial stress regarding his academic future.

55.     In July 2018, Mr. Bhatnagar had communications with Ms. Pirone and others via Zoom video conferencing, during which Ms. Pirone encouraged Mr. Bhatnagar to "get a degree from the program and move on" since "this program hasn't supported you to finish your work." Ms. Pirone also told Mr. Bhatnagar that he would be able to do so without ever completing his

10

thesis. He did not understand the basis for this suggestion since a completed thesis was clearly the key component of the degree.

56.     Shortly after these conversations, on July 17, 2018, Mr. Bhatnagar submitted his revised thesis project outline and statement to Ms. Pirone.  Nevertheless, on the same day he received a Registrar notification that his "application for graduation has been recorded for Summer 2018."

57.     Mr. Bhatnagar immediately reached out to Ms. Corson to correct the record since he had not requested a Summer 2018 graduation.  He had actually indicated a December 31, 2018 graduation, which the School knew.

58.     Ms. Pirone confirmed on a video conference call on July 19, 2018 that the Summer 2018 graduation and conferral, *without having any completed thesis*, was the only option on the table and that Mr. Bhatnagar "should feel liberated" by the opportunity to move on since the degree could be conferred without a completed thesis.

59.     When Mr. Bhatnagar asked Ms. Pirone why the December 31 option had been taken away, she responded that she "can't say why," that she was "not going to give [him] that information," and that "at whatever point you had that shared understanding, that was lost with Ms. Penin [and she] didn't want to get into whose fault it was [because she was] already in a very tight position since this deal had involved executives at the university."  Ms. Pirone went on to add that, in her opinion, Mr. Bhatnagar was "losing perspective" because he didn't need to complete the thesis in order to get the degree.

60.     Despite the anxiety this was all causing him and despite his misgivings about the entire chain of events and the latest decisions made by the School, Mr. Bhatnagar agreed to meet with Ms. Pirone upon their mutual return to New York City in August 2018.

11

61.     Before any such meeting could take place, Mr. Bhatnagar experienced a medical emergency brought on by the extreme stress the School had caused him throughout the Spring and Summer of 2018.  On August 14, 2018, Mr. Bhatnagar was found unresponsive in the street by a bystander while in Pittsburgh, Pennsylvania (where Mr. Bhatnagar has a residence) and transported to the hospital.

62.     He was kept in the hospital under observation for five days, and eventually discharged with, amongst other things, a doctor's report which listed the cause of his medical emergency to be stress-induced and related to the stresses caused by his interactions with staff and administration from the School.

63.     Upon Mr. Bhatnagar's return to New York City he had several meetings and conversations with Parsons' staff and administrators about his medical emergency as well as his thesis outline and related issues and about the timetable needed for him to complete his thesis in light of all of the conflicting information as well as his recent medical emergency.

64.     These meetings included a meeting with Joel Towers, Executive Dean of Parsons, who discussed Mr. Bhatnagar's thesis outline and made recommendations about sources for Mr. Bhatnagar to use.

65.     Mr. Bhatnagar left those meetings with the understanding that whatever the prior misunderstandings had been, that it had been resolved finally, and that he would have sufficient time to properly complete his studies with appropriate supports at Parsons.

66.     On August 28, 2018 Mr. Bhatnagar left the country for an academic conference in Sydney, Australia under the apparent false belief that the School had finally understood his needs and would be prepared to work with him to complete his thesis and degree properly upon his return in the beginning of September 2018.

12

67.     Unfortunately, once again Parsons had other intentions, and on September 6, 2018, Mr. Bhatnagar met with Mr. Towers, Ms. Pirone, and Ms. Corson, along with Director of Student Support Naim Rasul and Assistant Dean Joe Hosking for what Mr. Bhatnagar thought was a meeting to discuss how to work to get his thesis project and graduation timeline back on track.

68.     During this meeting, Mr. Bhatnagar was informed that, unbeknownst to him, his degree had *already* been conferred by the School. When Mr. Bhatnagar asked to understand the basis for such action and asked whether he could appeal the decision to confer his degree without his agreeing to it and without meeting the program prerequisites, Mr. Towers laughed at Mr. Bhatnagar's request.

69.     Mr. Bhatnagar then sought an explanation and guidance in order to understand how the school could graduate him without him having completed his studies and thesis and tried to appeal through the chain of administration at Parsons to be afforded the appropriate opportunity to complete his thesis and degree properly and was continually denied any meaningful help or assistance.

70.     Parsons' decision to confer a degree without Mr. Bhatnagar having met the degree requirements was a violation of the School's own rules and policies and New York State Education Law.

71.     The ultimate indignity took place on September 17, 2018, when Mr. Bhatnagar was told by Jennifer Francone, Chair of the University Appeals Committee, that there is no appeal of the decision to confer his degree, he was no longer allowed to access any of the School's buildings or properties, and he had been "officially declared Persona non grata" by the School.

13

## MR. BHATNAGAR'S DISCOVERY OF DISCRIMINATORY ANIMUS

72.     In March and May 2019 Mr. Bhatnagar exercised his right to review his education records under the Family Educational Rights and Privacy Act of 1974 ("FERPA"). That review made clear that Parsons believed that he had a disability of mental illness, Defendants perceived him as a threat, and these beliefs were the basis for the discriminatory actions they took toward him.

73.     Parsons would not provide him copies of documents in his file, would not allow him to make copies or take photographs of any such documents, and would not allow him to be alone in a room with any of his documents

74.     Mr. Bhatnagar therefore was relegated to typing nearly 1000 pages of documents and correspondence during the limited review times he was given. He was also monitored by Parsons' staff during his time-limited reviews.

75.     Upon information and belief, Parsons and other institutions, pursuant to FERPA, regularly provide copies of student records to students at the institution or student's costs.

76.     Overall, the record Mr. Bhatnagar reviewed and transcribed paints a picture of an administration and program that viewed Mr. Bhatnagar as someone with a disability of mental illness. Various administrators and instructors at the School describe Mr. Bhatnagar as "delusional", "paranoid", "troubled", "unprofessional", "inappropriate", "dysfunctional", a student for which they needed extra security because he was perceived as a threat, including the Provost stating specifically that Mr. Bhatnagar's situation is "a mental health issue".

77.     The paragraphs below contain several examples of Parsons' overtly discriminatory correspondence. All of these examples were transcribed from printouts of emails between individuals at Parsons. To the extent possible, Mr. Bhatnagar transcribed both the sender and the

recipient(s) and the dates and times of the emails.  Wherever such details are missing in this Complaint, a review of these correspondences during discovery would confirm any missing information.

78.    Upon information and belief, there are many more such examples of correspondence containing Parsons' discriminatory intent; however, Mr. Bhatnagar was only able to transcribe so much in the limited time that he was given for his FERPA review, presuming he was even given his complete education record to review.

79.    Prior to the discovery of this correspondence, Mr. Bhatnagar knew that he was being mistreated and presumed that the mistreatment was discriminatory.  After reviewing the Defendants' email correspondence, the school's discriminatory intent was made clear.

## AS AND FOR A FIRST CAUSE OF ACTION

80.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 79 above as though fully set forth herein.

81.    Defendants' intentionally discriminated against Plaintiff based on their perception of Mr. Bhatnagar as a person with a disability.

82.    Mr. Bhatnagar is an individual with a disability as defined in 42 U.S.C. § 12102(2)(B).

83.    Parsons is a "postgraduate private school" as defined in 42 U.S.C. § 12181(7)(j).

84.    Defendants "regarded" Plaintiff as having an impairment or disability as defined in 42 USC § 12102(3) and 34 CFR § 104.3(j)(2)(iv).

85.    Defendants intentionally discriminated against Plaintiff by forcing Plaintiff out of their education program based on his perceived disability in violation of the Americans With Disabilities Act of 1990, 42 USC §12101 et. seq.

15

86.     Defendants' discrimination against Plaintiff included, among other things: depriving Plaintiff of the opportunity to finish his degree program at Parsons; falsifying, changing, or creating incorrect grades for Plaintiff's classes; refusing to allow Plaintiff to remain enrolled in the program long enough to finish his degree when such opportunity is offered to other students not regarded as having a disability; disparaging Mr. Bhatnagar to colleagues at other institutions, and disregarding their own program degree requirements in order to force a fabricated degree upon Plaintiff.

87.     Mr. Bhatnagar's FERPA review of his student file documents evidenced discrimination *per se* and behavior that is not only unbecoming of stewards of a university, but also abhorrent and deplorable when exhibited by anyone.

88.     Upon review of the documents and correspondence that Mr. Bhatnagar was able to transcribe during his two FERPA reviews, he uncovered the true nature of the actions taken against him. His student record file made clear that the School had developed an irrational and unfounded fear of Mr. Bhatnagar on the bases of a real or perceived disability and that Parsons looked for a way to force Mr. Bhatnagar out of his program without the correct prerequisites in order to rid themselves of a student that they no longer wanted to deal with because of his perceived mental illness.

89.     The following excerpts from Mr. Bhatnagar's student file, presented in roughly chronological order, show the discriminatory animus that Parsons' administrators had and why they forced a fabricated degree upon Mr. Bhatnagar.

90.     These examples also show that actors within Parsons' administration and faculty were not always united in the School's approach toward Mr. Bhatnagar's perceived mental illness, with some staff wanting to consider ways in which the School might help a student with a

16

perceived disability of mental illness, while others (and indeed the prevailing approach at Parsons) looked for ways to rid the School of Mr. Bhatnagar rather than help him.

91.    As is evident from the correspondence, the voices at Parsons that appeared to be interested in looking to help Mr. Bhatnagar, such as Lisa Norton, Professor of Design Leadership and Associate Dean at that time, were ignored or drowned out by those who were much more interested in manufacturing a ruse to remove Mr. Bhatnagar from the School.

92.    In a May 31, 2018 email to Academic Advisor Jill Corson, Ms. Penin expressed her belief that Mr. Bhatnagar was having mental health issues and expressed her fear of him, telling Ms. Corson that Mr. Bhatnagar's "thinking seems to be clearly delusional. . . [Jennifer Francone] didn't take my request seriously for security presence during our graduation events - there was none. I remain fearful of him and am avoiding going to my own office because I fear he is around in D12." – Lara Penin to Jill Corson, May 31, 2018.

93.    In an email from Lisa Norton to her colleagues, she expresses her concerns for Mr. Bhatnagar's safety on account of his mental health. She wrote, "This seems to me an increasingly worrisome situation. In my opinion student health services should be weighing in on his mental health status to be sure he is safe." Lisa Norton to Heather O'Brien, Executive Assistant and Communications Manager for Provost Joe Hosking, Assistant Dean, and Jane Pirone, Dean of School of Design Strategies, and Jamer Hunt, Associate Professor, August 28, 2018.

94.    Jamer Hunt wrote to colleagues on August 29, 2018, "I don't want to be alarmist about Sankalp, or over-state the concern, but his behavior is odd and it would be good to know, at least, that he is operating under some sort of academic supervision. He's in a bit of academic limbo at the moment, and so there may not be much supervision. I spent quite a bit of time trying to supervise him in the Spring, only to be thrown under the bus in a public way, as others were. His

17

presentation at the thesis event was highly unprofessional to say the least, and his behavior was concerning enough that several of us, independently, worried for our safety. Fortunately, nothing came out of it. For me, that's probably a result of a climate of anxiety of mass violence on college campuses, but he certainly had an ax to grind against several of the people who have tried to support him as well as the institution." Jamer Hunt to Lisa Norton, Heather O'Brien, Joe Hosking, Jane Pirone, Lara Penin, August 29, 2018. Mr. Hunt was clearly put off by what he perceived to be Mr. Bhatnagar's criticisms of him and others at the College, and admittedly wrongly assumed that Mr. Bhatnagar posed some sort of threat, despite there being no evidence of same.

95.     Later, on September 6, 2018, Heather O'Brien again weighed in with her assessment of Mr. Bhatnagar's mental health and to let others know that the Provost's office had plans to deal with him: "He is a troubled student and we are dealing with it." – Heather O'Brien to Debora Bogosian, Chief of Staff to the President, September 6, 2018. Ms. O'Brien did not offer any help to Mr. Bhatnagar as a student that she and the Provost clearly thought was having a mental health issue, and notably, the President's office did not respond by email to direct such help either.

96.     On September 11, 2018, Academic Advisor Jill Corson shared others' uneasiness about Mr. Bhatnagar and proposed banning him from the campus, despite the fact that he had not done anything to warrant such treatment: "Hi Joe. Could you please let us know what to do should Sankalp pop into a class or meeting. Or if he requests a meeting? Thank you. Also . . . Quizayra [Gonzalez] told me on Friday that she feels uneasy now that Estafania and I are no longer working on the 7th floor of 6E16. She asked if Sankalp can be banned from that building. I want to pass this on to you." – Jill Corson, Academic Advising, to Lisa Norton, Jane Pirone, Joe Hosking, September 11, 2018. The School's conduct and treatment of him was based on perceived mental health disability.

18

97.     In an email the following day, Provost Tim Marshall plainly stated that: "It is a mental health issue as best as we can tell. He is refusing to graduate and wants to keep taking classes etc. Jamer and Joel have the full story but he is making people nervous." Tim Marshall, Provost, to Donald Resnick, Chief Enrollment and Success Officer, Michelle Relyea, Senior Vice President for Student Success, September 12, 2018.  Once again, the School identified Mr. Bhatnagar as an individual with a mental health disability but offered no help to Mr. Bhatnagar; rather, the School was clearly focused on removing him.

98.     In a similar vein, Ms. O'Brien shared the feelings of the Executive Dean that Mr. Bhatnagar's matter was a mental health issue, stating "Joel [Towers, Executive Dean] does not feel that this is an academic matter any longer and expressed concerns for Sankalp's mental health." – Heather O'Brien to Chris Rivera, [Date missing, possibly December 1, 2018].

99.     Ms. Norton expressed her significant concerns about Parsons' mistreatment and ostracism of Mr. Bhatnagar, and its failure to support a valuable member of the student body, telling her colleagues: "While the university gets its legal ass covered, a student (now forced to be an alumnus) languishes in our fragmented administrative dysfunction. What level of crisis is it going to take before we reach out to his family and make sure his needs are taken care of? It is not Sankalp who is dissociated but rather us who have lost all perspective on what it means to be a caring community. Stunned and disappointed."  Lisa Norton to Joe Hosking, Joel Towers, Gene Puno-DeLeon, Student Conduct, Keila Tennent, General Counsel, Naim Rasul, Jane Pirone, and Quizayra Gonzales, Graduate Student Advisor, September 13, 2018.

100.    Laura Auricchio, Professor of Art History, even identified the legal issue of the School's treatment of a disabled student in an email to colleagues: "Should we consult with general counsel? I'm particular concerned the language being used in these latest emails ("mental health"

19

concerns [from Chris for Joel], "one of the most troubling situations I have ever seen in higher ed" [from Lisa Norton]) have tipped us into territory that may require legal advice." Laura Auricchio to Heather O'Brien, Leslie Gerber, Assistant University Registrar, January 11, 2019.

101.    Ms. Norton again shared her concerns about the various mistreatments of Mr. Bhatnagar, including banning him from the School and cutting off his access to his School emails which contained important information: "Hi Tim, I just heard from Sankalp. Apparently he met with Jennifer Francone last week and was given print outs of important emails from October notifying him of his statuses. He had not received these until now (!) because he had been [Persona Non Grata]'ed and had his email revoked prior to them being sent. As I think you know, this whole Sankalp thing has been over the top. I am concerned and in my opinion we are extremely vulnerable. My perspective as usual differs from my colleagues. Although I'm sure you are incredibly busy, I would like to share it with you if you can make time." – Lisa Norton to Tim Marshall, Provost, January 29, 2019.

102.    Mr. Bhatnagar's review of his FERPA records also revealed evidence that Parsons' faculty and administrators conspired to modify or change his grades in order to force his degree upon him. Faculty and administrators discussed giving him a passing grade based only on limited work (including that he had not submitted a required paper in one course), as well as going so far as trying to claim that "he has completed his thesis and it was graded by faculty. I believe he feels it is not the best work he is capable of. But this is very different from not completing." That statement, made by Executive Dean Joel Towers in an email to colleagues on November 28, 2018, was patently false, since Mr. Bhatnagar had not completed his thesis.

103.    In an email from Heather O'Brien, Executive Assistant and Communications Manager for Provost Joe Hosking, to undefined recipients, Ms. O'Brien quoted a letter, that she

20

said Parsons attempted to give Mr. Bhatnagar but that he refused, as saying: "At the end of Spring 2018, you received grades of incomplete in three courses: the deadline for the thesis course and thesis seminar course were July 25. This was extended to August 25 in ["]Anthropology: history of the present["] was extended to August 27. As [J]ane [Pi]rone explained, you will receive grades of C+ for both thesis and the thesis seminar. You have now completed all MFA degree requirements." This email acknowledges that Parsons administrators changed Mr. Bhatnagar's grades from "incomplete" to C+ in order confer his degree upon him prematurely and without his having completed the requisite work of completing his thesis.

104.   Likewise, there are further emails that reveal the lengths that Ms. Pirone was willing to go in order to falsely confer Mr. Bhatnagar a degree, including an email from Ms. Pirone to Jill Corson on July 22, 2018 where Ms. Pirone plots ways in which she can concoct his false degree: "Could we grade him for both Thesis Studio and Seminar on July 25 (the original deadline) at a C+ as we discussed[?] and because of that begin the conferral process immediately and prevent him from [registering] for anything else on August 1, THEN, if he actually does submit [any] further work by the new deadline I gave him AUG 25 (which, btw, I'm even less optimistic about now based upon my last conversation with him this past Thursday), change the grade if appropriate prior to his actual graduation… possible? I believe he does not need ann stoler's course to graduate - he told me during our conversation he went about the 18/19 CR to take it and paid the additional tuition for it." This is further evidence that the school was apparently willing to twist themselves into proverbial pretzels in order to force out a student they perceived as disabled.

105.   In addition to the discriminatory treatment described above, Parsons also disparaged Mr. Bhatnagar to others based on their perception of his mental illness and portrayal of him as a threat. While in Sydney in August 2018, Mr. Bhatnagar visited Cameron Tonkinwise, a

former professor of his from his time at Carnegie Mellon and a former employee of Parsons, where Mr. Tonkinwise had helped set up the Transdisciplinary Design MFA program as part of its core faculty in the program's early years. Mr. Bhatnagar's last prior substantive conversation with Mr. Tonkinwise was during a one-on-one dinner in Pittsburgh in August 2016 before Mr. Bhatnagar began at Parsons, at which time Mr. Tonkinwise expressed his excitement for Mr. Bhatnagar's coming years in New York City and at Parsons. Much to Mr. Bhatnagar's surprise, when Mr. Bhatnagar visited him in Australia, Mr. Tonkinwise was dismissive and escorted him from the campus, where his bags were searched by security, without a sufficient explanation for such treatment. At the time, Mr. Bhatnagar had no idea why his former professor, with whom he felt he always had a good working relationship, would have treated him this way.

106.    Mr. Bhatnagar's FERPA review revealed emails between Ms. Penin and Mr. Tonkinwise which explained that Ms. Penin and Joel Towers had been in touch with Mr. Tonkinwise and had disparaged Mr. Bhatnagar to Mr. Tonkinwise prior to their interaction in Australia.

107.    The School even discriminated against Mr. Bhatnagar with respect to his request to review his own student record, which was his right to do pursuant to FERPA, as they did not provide copies of records to Mr. Bhatnagar as is, upon information and belief, standard practice for Parsons and other institutions.

108.    Upon information and belief, Defendants additionally failed to maintain adequate and legal anti-discrimination policies and failed to follow the policies that they did have in place during all relevant times referred to in this Complaint.

109.    By their discriminatory actions, Defendants have: deprived Plaintiff of the opportunity to proceed in his academic field; deprived Plaintiff of the opportunity to pursue a

research career in the design field; caused Plaintiff such severe stress that he was hospitalized during the pendency of these actions; and caused financial and emotional harm to Plaintiff.

110. Mr. Bhatnagar has been rejected by six different PhD programs since leaving Parsons. Upon information and belief, those rejections were because of Mr. Bhatnagar's lack of a completed and final thesis, lack of an accurate and complete transcript of his time at Parsons, and lack of letters of recommendation from his Parsons' instructors, all of which he would have had but for the Defendants' discriminatory actions against him.

111. Plaintiff experienced lost tuition and living expenses, lost medical costs, lost wages, emotional pain and suffering, stress, anxiety, loss of enjoyment of life, humiliation, indignity, inconvenience, and other monetary harms as a result of Defendants' actions.

## AS AND FOR A SECOND CAUSE OF ACTION

112. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 79 and 81 through 111 above as though fully set forth therein.

113. Defendants intentionally discriminated against Mr. Bhatnagar based on their perception, or regard, of Mr. Bhatnagar as a person with a disability.

114. Mr. Bhatnagar is an individual with a disability or regarded as having a disability as defined in 29 U.S.C. § 705(9)(B).

115. Parsons is a private school that receives federal financial assistance as defined in 29 U.S.C. § 794(b)(3)(A).

116. Defendants intentionally discriminated against Plaintiff by forcing Plaintiff out of their education program based on his perceived disability in violation of Section 504 of the Rehabilitation Act of 1973, 29 USC §701 et. seq.

117.    Defendants' discrimination against Plaintiff included: depriving Plaintiff of the opportunity to finish his degree program at Parsons; falsifying, changing, or creating incorrect grades for Plaintiff's classes; refusing to allow Plaintiff to remain enrolled in the program long enough to finish his degree when such opportunity is offered to other students not regarded as having a disability; and disregarding their own program degree requirements in order to force a fabricated degree upon Plaintiff.

118.    By their discriminatory actions, Defendants have: deprived Plaintiff of the opportunity to proceed in his academic field; deprived Plaintiff of the opportunity to pursue a research career in the field of design; caused Plaintiff such severe stress that he was hospitalized during the pendency of these actions; and caused financial and emotional harm for Plaintiff.

119.    Plaintiff experienced lost tuition and living expenses, lost medical costs, lost wages, emotional pain and suffering, stress, anxiety, loss of enjoyment of life, humiliation, inconvenience, and other monetary and dignitary harms as a result of Defendants' actions.

## AS AND FOR A THIRD CAUSE OF ACTION

120.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 79 and 81 through 111 above as though fully set forth herein.

121.    Defendants intentionally discriminated against Plaintiff on account of his race and national origin in violation of Title VI of the Civil Rights Act of 1964, 42 USC §2000d et. seq.,

122.    Mr. Bhatnagar is a person as defined in 42 USC §2000d.

123.    Parsons is a private school that is a "program" as defined in 42 USCS § 2000d-4a(2)(a).

124.    The actions that Parsons took in forcing a fabricated degree upon Plaintiff and all of the related conduct was perpetrated with a discriminatory intent as the School feared that Mr.

Bhatnagar posed some threat, based on his race and national origin, and the School's discriminatory beliefs about Mr. Bhatnagar were a substantial and motivating factor for Defendants' actions.

125.   Mr. Bhatnagar never took a single threatening action toward anyone at the School at any time, so the only basis for any supposed fear of a threat was the discriminatory perceptions of employees at the School based upon their belief that Mr. Bhatnagar had mental illness and was of a different race or ethnicity that they ignorantly perceived as threatening.

126.   Mr. Bhatnagar, in presenting his thesis outline as a check-in point review on May 10, 2018, referred to the negative interactions he was having with staff, specifically including Mr. Staszowski and Ms. Penin, but he presented reflectively this as an issue upon which he could draw in completing his thesis in the School since his thesis was focused on changes in design education with Parsons' design program as a case study.

127.   Mr. Bhatnagar's thesis presentation was actually focused on two themes:  First, how a designer (in this case, himself) operates in the context of a system they are a part of (in this case, a research institution) including the pitfalls that may present themselves such as potentially difficult interactions with faculty and advisors.  Mr. Bhatnagar called upon his own experiences with Ms. Penin and Mr. Staszowski in illustrating these issues.  Secondly, Mr. Bhatnagar analyzed the history of the Parsons' design program itself and he sought to explore how changes to the program affected design students such as himself.

128.   Mr. Bhatnagar inserted himself and his experiences directly into his presentation because he valued situated inquiry and viewed his revised thesis as being both critically reflexive and appropriately critical of the field of design as a whole, with Parsons' design program as one instance of design education with which to model historical changes.  Mr. Bhatnagar did not

present anything unseemly and considered the criticism he presented as appropriate to the thesis study he was embarking upon.

129.    Mr. Bhatnagar made no threatening statements toward anyone at the School in this presentation or at any time thereafter, yet Parsons' staff decided to treat him as a threat and force him out simply because they believed he was mentally ill and for other discriminatory reasons, including at least for some because of his race and ethnicity.

130.    Parsons' irrational and discriminatory treatment of Mr. Bhatnagar was, at times, patently absurd and dumbfounding. In one such example, the School, which had apparently been monitoring Mr. Bhatnagar's mail, intercepted an envelope that the School believed was potentially dangerous because it appeared to someone from the School that it was a letter mailed from Mr. Bhatnagar to himself. The School then segregated the letter, escalated the concern to Scott Belford of Campus Emergency Operations, returned it to sender via Federal Express, and did not give it to Mr. Bhatnagar for this reason.

131.    In reality, the envelope contained a birthday card from Mr. Bhatnagar's mother. The School's apparent concern was based on the fact that Mr. Bhatnagar and his mother share the same initials. They believed he was mailing the letter to himself and could not understand why. For no rational reason, they assumed nefarious purposes. This incident is a clear example of the irrational, illegal, and discriminatory treatment that the School was applying to Mr. Bhatnagar.

132.    Another example of the discriminatory treatment and irrational fear that Parsons' administrators and officers were exhibiting took place in August 2018, when Mr. Bhatnagar was followed and monitored around campus simply because he was carrying a backpack and another bag along with some packages that he was mailing with him at the time.

133.    On August 29, 2018, Ms. Penin sent an email to Executive Dean Towers in which she summarized as follows: "Sankalp went to [campus] yesterday and was acting strangely [and] he was carrying a backpack and another handbag. He left his luggage there for some time and at a later unspecified moment collect [sic] these items. He was also carrying some small packages the size of a wallet that he was mailing to him or some other people (unclear). Security was called in and opened these packages, Cayce [Pack, Associate Director of the Zolberg Institute] was concerned about what they might contain. It's not clear exactly what was inside but it was not a weapon. They were all worried, Cayce expressed concern over his own mental state as well as security for others."

134.    Mr. Bhatnagar was not aware that anyone had ever searched his belongings in this manner until after the fact, when he discovered these emails during his FERPA review. These unauthorized and undisclosed searches of Mr. Bhatnagar's belongings were all conducted without his knowledge or presence.

135.    Again, for no apparent reason Parsons' administrators treated Mr. Bhatnagar as a threat when he had done absolutely nothing threatening to anyone at the school. Ms. Penin's email purports to "express concern over" Mr. Bhatnagar's mental health, yet Parsons did not offer to help or accommodate him, and instead sought to rid him from the School and ban him from the campus for discriminatory reasons.

136.    Even though the School ultimately found that Mr. Bhatnagar was no threat after harassing him and searching his mail and possessions, Parsons took things one step further and declared Mr. Bhatnagar "persona non grata" and banned him from campus, based solely on their own discriminatory reasons.

137. In emails from the days that followed the discriminatory false alarm on August 29, 2018, the administration, and specifically Ms. Penin, doubled down on their discriminatory harassment and actions toward Mr. Bhatnagar.

138. Jamer Hunt's August 29, 2018 email, referred to in paragraph 94 above, noted that "several of us, independently, worried for our safety. Fortunately, nothing came out of it. For me, that's probably a result of a climate of anxiety of mass violence on college campuses . . ."

139. In an email, dated August 30, 2018, to Joe Hosking and others at the School, Ms. Penin wrote: "Given his erratic behavior this week I'm growing increasingly uncomfortable and worry about our students and faculty safety, I wonder if it would be possible to restrict his access to our building at least temporarily. I understand that it might not be possible policy-wise but wanted to discuss this possibility anyway. Thanks, Lara"

140. The "erratic" behavior that Ms. Penin referred to consisted of Mr. Bhatnagar talking to people he knew at Parsons about his upcoming trip to Australia for an academic conference, including asking for advice on where to purchase a last-minute ticket, and the fact that he was carrying two bags and packages, as discussed in paragraph 133 above. Ms. Penin did not explain why these innocent events would be considered as "erratic" by any non-biased person.

141. In response, on August 30, 2018, Naim Rasul, Director of Student Support and Crisis Management, stated: "I am in the process of consulting with Gene and Jennifer on policy and options regarding Sankalp and building access. I will get back to [sic] as soon as possible."

142. Mr. Bhatnagar, who had merely been continuing to try to understand his academic status and situation, both in-person and through correspondence with Parsons' faculty and administrators since he was still hoping to be able to properly finish his thesis as was required to

be legitimately conferred the degree, was told of his "persona non grata" banning on September 17, 2018.

143.     Mr. Bhatnagar tried in vain after that date to understand why he was banned and what that meant for any possibility that he might be able to finish his program but Defendants cut him off from all access entirely and nobody at the school would speak to him or explain the situation or decisions that the School had made.

144.     The actions of humiliating Mr. Bhatnagar by inspecting his mail and possessions and banning him from the Parsons campus were taken by Defendants because of their discriminatory intent and prejudices concerning Mr. Bhatnagar's South Indian background and his brown skin.

145.     Parsons took these actions against Mr. Bhatnagar for no legitimate reason since Mr. Bhatnagar had never presented any threat to anyone at Parsons and they were rather discriminating against him due to their own "climate of anxiety."

146.     Parsons also discriminated against Mr. Bhatnagar on the basis of race and national origin when it banned him from campus, officially declaring him persona non grata, for no legitimate, nondiscriminatory, reason.

147.     Defendants further discriminated against Mr. Bhatnagar based on his race and national origin by disparaging him to outsiders, including Mr. Tonkinwise (see ¶¶ 105-06 above), because of their portrayal of him as a threat due to his race and national origin,

148.     By their discriminatory actions, Defendants have: deprived Plaintiff of the opportunity to proceed in his academic field; deprived Plaintiff of the opportunity to pursue a research career in the field of design; caused Plaintiff such severe stress that he was hospitalized during the pendency of these actions; and caused financial and emotional harm for Plaintiff,

including because of the humiliation and embarrassment of subjecting Mr. Bhatnagar to unwarranted searches and seizures of his private mail and belongings.

149.    Plaintiff experienced lost tuition and living expenses, lost medical costs, lost wages, emotional pain and suffering, stress, anxiety, loss of enjoyment of life, humiliation, inconvenience, and other monetary and dignitary harms as a result of Defendants' actions.

## AS AND FOR A FOURTH CAUSE OF ACTION

150.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 79, 81 through 111, and 121 through 149 above as though fully set forth herein.

151.    Mr. Bhatnagar is a "person" as defined in New York State Human Rights Law, NY Executive Law §292(1).

152.    Parsons is an "educational institution" as defined in Executive Law §292(37)(a).

153.    Defendants discriminated against Plaintiff and violated his "opportunity to obtain education" based on his perceived disability, race, and national origin, all in violation of the New York State Human Rights Law, NY Executive Law §291(2). Defendants' discrimination against Plaintiff included: depriving Plaintiff of the opportunity to finish his degree program at Parsons; falsifying, changing, or creating incorrect grades for Plaintiff's classes; refusing to allow Plaintiff to remain enrolled in the program long enough to finish his degree when such opportunity is offered to other students not regarded as having a disability; and disregarding their own program degree requirements in order to force a fabricated degree upon Plaintiff.

154.    By their discriminatory actions, Defendants have: deprived Plaintiff of the opportunity to proceed in his academic field; deprived Plaintiff of the opportunity to pursue a research career in the field of design; caused Plaintiff such severe stress that he was hospitalized during the pendency of these actions; and caused financial and emotional harm for Plaintiff.

30

155.    Plaintiff experienced lost tuition and living expenses, medical costs, lost wages, emotional pain and suffering, stress, anxiety, loss of enjoyment of life, humiliation, inconvenience, and other monetary and dignitary harms as a result of Defendants' actions.

## AS AND FOR A FIFTH CAUSE OF ACTION

156.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 79, 81 through 111, and 121 through 149 above as though fully set forth herein.

157.    Mr. Bhatnagar is a "person" as defined in New York City Administrative Code §8-102.

158.    Parsons is an "educational institution" as defined in New York City Administrative Code §8-102.

159.    Defendants discriminated against Plaintiff based on his perceived disability, race, and national origin in violation of the New York City Human Rights Law, New York City Administrative Code, § 8-101 et. seq. Defendants' discrimination against Plaintiff included: depriving Plaintiff of the opportunity to finish his degree program at Parsons; falsifying, changing, or creating incorrect grades for Plaintiff's classes; refusing to allow Plaintiff to remain enrolled in the program long enough to finish his degree when such opportunity is offered to other students not regarded as having a disability; and disregarding their own program degree requirements in order to force a fabricated degree upon Plaintiff.

160.    By their discriminatory actions, Defendants have: deprived Plaintiff of the opportunity to proceed in his academic field; deprived Plaintiff of the opportunity to pursue a research career in the field of design; caused Plaintiff such severe stress that he was hospitalized during the pendency of these actions; and caused financial and emotional harm for Plaintiff.

31

161.    Plaintiff experienced lost tuition and living expenses, lost medical costs, lost wages, emotional pain and suffering, stress, anxiety, loss of enjoyment of life, humiliation, inconvenience, and other monetary and dignitary harms as a result of Defendants' actions.

## AS AND FOR A SIXTH CAUSE OF ACTION

162.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 79, 81 through 111, and 121 through 149 above as though fully set forth herein.

163.    By his enrollment in Parsons, Mr. Bhatnagar was in a contractual relationship with the school. Part of that contract included the implied agreement that if the student complies with the terms prescribed by the institution, he will obtain the degree which he sought. Mr. Bhatnagar met his obligations under the contract by paying his tuition and successfully meeting program requirements.  By failing to follow their own clearly prescribed degree requirements and regulations in conferring a degree, Defendants have breached their duties under that contract.

164.    The School developed the concept of essentially forcing an unwarranted degree upon Mr. Bhatnagar in order to force him out of the School and avoid any supposed trouble he may cause based on his perceived disabilities and/or his racial and ethnic background. The School decided that it would essentially brush under the rug the fact that Mr. Bhatnagar had not completed the single most essential task – completing a faculty-reviewed written thesis and accompanying design project – in order to complete his program and earn his degree.

165.    There is no legitimate basis upon which the School could have made this determination – that either Mr. Bhatnagar had completed or submitted a thesis (because he did not) or that it was not a requirement of the program to have completed a thesis in order to graduate.

166.    Parsons defines in numerous places the thesis as fundamental to, and required of, the MFA design degree. Indeed, Mr. Bhatnagar's FERPA review revealed email correspondence

32

confirming same. In an email from Lara Penin to Jill Corson on April 16, 2018, Ms. Penin states: "I want to make it clear that a written thesis is a requirement of the program as it is described in Thesis 2 syllabus. Thesis 2 is a 9 credit course and is required to [sic] the completion of the degree. This has been the case since the program started and there are no plans to change it. So the final answer to Sankalp and whoever else asks this question in the future, is that the written thesis is a requirement for graduation."

167.    Thus, by suspending its degree requirements and ignoring its established, requisite standards pertaining to same, the School made a blatant and discriminatory decision to completely forego the degree requirements in order to force Mr. Bhatnagar out.

168.    In so doing, Parsons also violated its degree requirements as specifically described in the program course catalog, its Master Plan approved by the New York State Education Department ("SED"), and the School's National Association of Schools of Art and Design Self Study, amongst other sources, including all relevant syllabi, mandating and requiring a completed thesis for graduation.

169.    Mr. Bhatnagar's record further shows that the School went so far as to manipulate grades in order to ensure that Mr. Bhatnagar would be able to graduate, even though he was never able to complete his final courses at Parsons.

170.    In the end, the School's leadership, administrators, and staff discriminated against Mr. Bhatnagar on account of his disability, real or perceived, and his race and ethnicity, and worked against him with the sole goal of forcing him out of the institution as quickly as possible.

171.    This resulted in Mr. Bhatnagar receiving a worthless degree because an MFA design degree without a completed masters thesis cannot be used to apply for PhD programs, to teach studio-based design at the graduate level, or to qualify for research jobs in the design field.

33

Mr. Bhatnagar had always intended to pursue the PhD which was the very reason why he attended Parsons in the first place.

172.    Mr. Bhatnagar was also left with a transcript which contained academic blemishes, specifically his grades in his "last" semester which are not reflective of his ability and history as a student and, along with the lack of thesis, have assured him that he cannot move on in academia or working in his field. Mr. Bhatnagar's last semester grades were inaccurate because he was unable to complete that semester's work, including his thesis, and because Parsons modified his grades in order to force him out.

173.    Thus, for all these reasons, and by knowingly and intentionally ignoring and failing to follow their prescribed degree requirements in conferring a degree upon Mr. Bhatnagar, and compelling him to graduate, Parsons breached its contractual duties and obligations to him.

174.    As a result, Mr. Bhatnagar should be awarded monetary damages representing the costs of his contract with Defendants as well as further monetary damages for compensation of all other financial losses arising out of Defendants' breach.

## AS AND FOR A SEVENTH CAUSE OF ACTION

175.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 79, 81 through 111, 121 through 149, and 163 through 174 above as though fully set forth herein.

176.    Defendants violated New York State Education Law and Regulations by conferring a degree upon Mr. Bhatnagar without him having completed the degree requirements; most notably the required thesis.

177.    New York State Education and the Regulations promulgated thereunder forbids colleges from conferring degrees upon "any person who has not completed the program of study

34

requisite to such degree, which institution shall be authorized to confer the same. No earned undergraduate or graduate degree shall be conferred unless the applicant has completed a program registered by" the State Education Department.  8 NYCRR §3.47.

178.   New York Education Law §237 requires institutions of higher learning to register their Master Plans with the State Education Department.  Parsons' program is registered with the State Education Department pursuant to that law.

179.   Since Parsons' Master Plan delineates completion of a thesis as a required component of the degree, the School's proffering of a degree to Mr. Bhatnagar without that necessary component was a violation of the School's Master Plan and the law.

180.   Defendants' violation of law resulted in Mr. Bhatnagar receiving a worthless degree and have left him unable to pursue further education or research work in the design field.

181.   Mr. Bhatnagar experienced lost tuition and living expenses, lost wages, indignities, inconvenience, and other monetary harms as a result of Defendants' violations.

**WHEREFORE,** Plaintiff demands judgment against Defendants:

A.     An award to Plaintiff of compensatory and punitive damages for tuition and living expenses, healthcare and hospitalization costs, lost wages (including bonuses and benefits) in an amount be determined at trial for Defendants' willful violation of the ADA, Section 504, Title VI, NYS Human Rights Law, and NYC Human Rights Law;

B.     An award to Plaintiff of compensation for the nonpecuniary damages he suffered as a result of Defendants' unlawful discriminatory actions described above, including damages for emotional pain and suffering, anxiety, stress, loss of enjoyment of life, indignities, humiliation, and other harms;

35

C.  Ordering Defendants to prevent such discrimination from happening to other Parsons' students going forward by adopting appropriate anti-discrimination policies, providing anti-discrimination trainings to their employees, and engaging in other appropriate anti-discrimination programs and activities to ensure that such discrimination does not happen prospectively;

D.  In favor of Plaintiff for reasonable attorney's fees;

E.  In favor of Plaintiff for costs and disbursements of the action; and

F.  For such other and further relief that the Court may deem just and equitable.

SHEBITZ BERMAN & DELFORTE, P.C.

By: _____
Jacob S. Claveloux
Attorneys for Plaintiff
1350 Avenue of the Americas, 2nd Floor
New York, NY 10019

Dated: New York, New York
March 16, 2020

36